**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

DANNY GARRETT, ANDREW CARVER,
DEVON STINSON, JOHN SNEATHEN,
BRIAN MCCARTY, MATT LANGLITZ,
RICHARD CAGE, ISAAC FLORES,
ELIZABETH FERRALES, BRANDON SKINNER,
and HOYT MACIAIN,

Plaintiffs,

v. Civ. No. 25-1066 GJF/KRS

CITY OF CARLSBAD and
JESSIE RODRIGUEZ, in his individual capacity
and in his capacity as Chief of Police,

Defendants.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**
**OF THE FEDERAL RULES OF CIVIL PROCEDURE**

THIS MATTER is before the Court on Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 51. The Motion is fully briefed. *See* Dkt. Nos. 56, 57. Having considered the filings, arguments, and relevant law, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion. Specifically, the Court will **GRANT** the Motion to the extent it seeks dismissal of Plaintiffs' First Amendment retaliation claims premised on freedom of speech and of Plaintiffs' Fourteenth Amendment procedural due process claims. The Court will **DENY** the Motion to the extent it seeks dismissal of (1) Plaintiffs' First Amendment retaliation claims premised on freedom of association and (2) Plaintiffs' state law claims.

## I. BACKGROUND[1]

The Carlsbad Police Department ("CPD") operates under the control and supervision of the City of Carlsbad ("the City"). Dkt. No. 50 ¶ 13. At all relevant times, Defendant Jessie Rodriguez was the Chief of Police and administrative head of CPD, which has approximately 70 employees. *Id.* ¶¶ 14, 135. As of May 27, 2025, there were 36 vacancies at CPD (approximately one half of the CPD workforce). *Id.* ¶ 136. In addition, on at least two occasions, a majority of the Carlsbad Police Officer Association voted no confidence in CPD leadership. *Id.* ¶ 137. Mayor Rick Lopez and the City Administration were aware of these issues within CPD and the resulting resignations. *Id.* ¶ 138.

Plaintiffs are former CPD officers who allege that they endured an environment marked by intimidation and retaliation against officers perceived as disloyal to Chief Rodriguez's administration.[2] *Id.* ¶ 15. Shortly after becoming Chief, Rodriguez began requiring Plaintiffs to demonstrate personal or political loyalty as a condition of continued employment, including publicly supporting his leadership or political activities, participating in non-job-related meetings or events to support him in his political capacity as elected Chief, and refraining from expressing disagreement with management decisions. *Id.* ¶ 141. Chief Rodriguez also removed signs, slogans, and remnants of the prior administration, signaling that he viewed any reference to it as disloyal. *Id.* ¶ 142. Plaintiffs objected to and refused to comply with Chief Rodriguez's loyalty demands, asserting that those demands infringed upon their rights to freedom of speech and association. *Id.* ¶ 143. When Plaintiffs failed to follow the career path that he directed, Chief Rodriguez retaliated

---

[1] The facts that follow are taken from the Second Amended Complaint (Dkt. No. 50) and are accepted as true for purposes of this Motion. *See Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024).

[2] Although the Second Amended Complaint also named four spouses of former officers, the Court previously dismissed the spouses' claims for failure to state a claim, leaving only the former officers' claims. *See* Dkt. No. 59.

by reassigning or demoting them to less desirable duties; excluding them from meetings and communications; disparaging them publicly and privately; removing them from special forces; imposing unwarranted disciplinary action; and making implicit or explicit threats to their job security. *Id.* ¶ 145. Ultimately, the sustained retaliation and coercion to which Plaintiffs were subject led each of them to resign from CPD. *Id.* ¶ 147.

Danny Garrett joined CPD as Assistant Chief of Police. *Id.* ¶ 20. When then-Chief Brandon Skinner left CPD, Garrett began serving as Acting Chief. *Id.* ¶¶ 22–23. Although Garrett applied for the permanent Police Chief position, Defendant Rodriguez was selected instead. *Id.* at 25. Garrett alleges that he made a good faith effort to work with Chief Rodriguez but "met with hostility" and "experienced emotional distress, including symptoms of depression and anxiety due to the work environment being created by Defendant Rodriguez." *Id.* ¶¶ 27–29. When Defendant Rodriguez gave him the choice of resigning or being fired, Garrett resigned. *Id.* ¶ 30.

At relevant times, Andrew Carver was a captain at CPD, where he had been employed for eleven years with a "stellar record." *Id.* ¶¶ 31–32. When the Assistant Chief position became vacant under then-Chief Brandon Skinner, Carver applied, as did Defendant Rodriguez and Danny Garrett. *Id.* ¶ 34. Garrett was ultimately selected, but Defendant Rodriguez perceived Carver as "against him." *Id.* When Defendant Rodriguez later became Chief, he formed an inner circle of employees who pledged their loyalty to him. *Id.* ¶ 35. Carver was outside the inner circle and among the "targeted employee[s]" who Defendant Rodriguez intended "to get rid of." *Id.* ¶¶ 35–36. "Defendant Rodriguez led a strategic process to push Carver, and others, out of CPD," including writing Carver up three times in nine weeks for alleged disciplinary violations. *Id.* ¶ 37. As a result, Carver was demoted to Sergeant and had his probationary period reinstated. *Id.* Carver's stress and emotional distress escalated, and he ultimately resigned from CPD. *Id.* ¶ 38.

In December 2015, Devon Stinson joined CPD, where he worked for nearly ten years. *Id.* ¶ 39. For eight of those years, Stinson served on the Pecos Valley Drug Task Force, which was a federally-funded collaboration with the Eddy County Sheriff's Office over which CPD did not have sole control. *Id.* ¶ 39. Like Carver and other Plaintiffs, Stinson was outside of Defendant Rodriguez's inner circle. *Id.* ¶ 42. In addition, Defendant Rodriguez had an unfavorable view of the Task Force programs because he could not oversee or control them. *Id.* Upon becoming Chief, Defendant Rodriguez removed Stinson from the Task Force, placed him on patrol, and gave him a substandard vehicle and shoddy equipment. *Id.* ¶ 43. Stinson also became the target of "unwarranted disciplinary action and was subjected to Defendant Rodriguez'[s] manipulation and intimidation." *Id.* Suffering from emotional distress, Stinson resigned. *Id.* ¶ 44.

John Sneathen began working for CPD in 2011. *Id.* ¶ 45. Eight years later, he too joined the Task Force. *Id.* He was an excellent employee and, in 2022, was recognized as "Investigator of the Year." *Id.* ¶ 46. Upon becoming Chief, Defendant Rodriguez approached Sneathen and offered him an administrative position under his command. *Id.* ¶ 48. Sneathen declined, indicating that he enjoyed the work he was doing with the Task Force. *Id.* Sneathen was then transferred from the Task Force to patrol. *Id.* ¶ 49. He protested, explaining that Task Force investigations would suffer due to his removal and that of others. *Id.* Like Stinson, Sneathen was provided a substandard vehicle and equipment to perform his patrol duties with CPD. *Id.* ¶ 50. He also began receiving "unwarranted negative comments and disciplinary action" and was "filled with anxiety and uncertainty." *Id.* ¶ 51. Like Stinson and the other Plaintiffs, Sneathen ultimately resigned. *Id.* ¶ 52.

Brian McCarty began working for CPD in November 2018. *Id.* ¶ 53. When then-Chief Skinner evaluated him for promotion, McCarty received a high score and was reported to be "well-qualified to be a Captain." *Id.* ¶ 54. Once Defendant Rodriguez became Chief, however, Rodriguez

confronted McCarty about a purported statement that McCarty would leave CPD if Rodriguez became Chief. *Id.* ¶ 55. McCarty denied making such a statement. *Id.* Despite previously receiving positive performance evaluations, McCarty suddenly began receiving negative evaluations and became the subject of "negative remarks." *Id.* ¶ 56. McCarty learned that he was among Defendant Rodriguez's "targeted employees." *Id.* ¶ 57. When a Captain position came open, McCarty decided to "assess" for that position. *Id.* Defendant Rodriguez rejected McCarty's application, telling McCarty that he disagreed with former Chief Skinner's assessment of McCarty's qualifications. *Id.* McCarty was twice written up for disciplinary action (once for insubordination) and began losing incentive pay. *Id.* ¶ 58. According to McCarty, Defendant Rodriguez attempted to destroy his law enforcement career, which led to emotional distress that manifested in physical symptoms. *Id.* ¶ 59. McCarty ultimately resigned. *Id.* ¶ 60.

Matt Langlitz worked for CPD for nearly 15 years, during which time he generally kept his distance from Defendant Rodriguez. *Id.* ¶¶ 61–62. On one occasion, however, Defendant Rodriguez (then a Captain) directed Langlitz (then a Sergeant) to prosecute an individual despite insufficient evidence to warrant the prosecution. *Id.* ¶ 62. Having maintained a grudge against Langlitz, Defendant Rodriguez targeted Langlitz for termination. *Id.* ¶ 63. Although Langlitz attempted to avoid interactions with Defendant Rodriguez, he suffered from emotional distress due to Defendant Rodriguez's intimidation and harassment. *Id.* ¶ 64. In addition, Langlitz was named in an "unfounded citizen complaint," and despite no finding of wrongdoing, Defendant Rodriguez issued a written reprimand against Langlitz and cut his pay. *Id.* ¶ 65. Langlitz ultimately resigned. *Id.* ¶ 66.

Richard Cage began working for CPD in January 2015 after five years with the Artesia Police Department. *Id.* ¶ 67. In 2018, he worked in Internal Affairs, where Defendant Rodriguez

was his direct supervisor. *Id.* ¶ 68. During that time, Defendant Rodriguez had a habit of making inappropriate or offensive comments to Cage, including telling Cage that he reminded him of his son and "sometimes [he] just want[ed] to bend [him] over [his] knee and spank [him]." *Id.* After Cage congratulated Defendant Rodriguez on his promotion to Chief, Rodriguez responded that he knew Cage was talking to other agencies. *Id.* ¶ 69. The emotional distress and work environment that Cage endured led him to resign. *Id.* ¶ 71.

Defendant Rodriguez was condescending toward Isaac Flores from the time Flores joined CPD in May 2011. *Id.* ¶¶ 72–73. As a result, Flores began avoiding contact with Defendant Rodriguez. *Id.* ¶ 73. For the last eight years of his career at CPD, Flores served as a School Resource Officer at Carlsbad High School. *Id.* ¶ 74. In that capacity, he participated in as many training and educational opportunities as possible, and he established good relationships between the school district, the City, and CPD. *Id.* ¶¶ 74–75. Flores's performance evaluations were positive and noted his good work. *Id.* ¶ 75. Nevertheless, Flores was notified that he would be moved to patrol. *Id.* ¶ 76. During the summer, CPD's School Resource Officers who were grant-funded received preferential assignments, whereas Flores, the only School Resource Officer who was not grant-funded, was assigned to patrol. *Id.* ¶ 77. Defendant purported to reassign Flores to patrol solely because his position was not grant-funded. *Id.* Flores ultimately resigned from CPD, joining a different law enforcement agency. *Id.* ¶ 79.

Elizabeth Ferrales worked for CPD for over 13 years. *Id.* ¶ 80. Before Defendant Rodriguez became Chief, Ferrales opposed Defendant Rodriguez's protection of a member of his inner circle from allegations of sexually harassing another member of CPD. *Id.* ¶ 81. In another instance, Ferrales approached Defendant Rodriguez for help when the department payroll software she was using developed technical issues. *Id.* ¶ 82. Ferrales warned Defendant Rodriguez that employees

would not receive paychecks if the software issue was not fixed. *Id*. Defendant Rodriguez became angry and told Ferrales that "people didn't like her and she was mean." *Id*. When CPD announced Defendant Rodriguez would become Chief, Ferrales became nervous and distraught and ultimately resigned. *Id*. ¶¶ 84–85. As the first of the Plaintiffs to resign, she advised the City's Human Resources Department of the problems with Defendant Rodriguez. *Id*. ¶ 86.

Brandon "Shane" Skinner began working in CPD's patrol division in September 2015. *Id*. ¶¶ 87–88. Skinner excelled at CPD, and his work record and leadership skills led to his selection as Chief of Police. *Id*. ¶ 89. As Chief, he made improvements at CPD that led to increased visibility and goodwill in the community and earned praise for advocating modernized policing technology that improved public safety. *Id*. ¶ 90. Defendant Rodriguez made it known that he aimed to become Chief, and he made a concerted effort to achieve that goal. *Id*. ¶ 91. On November 24, 2025, the Human Resources Director/City Administrator, Sandy Countryman, and Deputy City Administrator, Ken Ahrens, presented Skinner with a Notice of Investigation of Sexual Relationship, which alleged that Skinner had engaged in an inappropriate sexual relationship with another CPD employee. *Id*. ¶ 94. Skinner adamantly denied the allegation, which the HR Director and Deputy City Administrator reported was "based on rumors." *Id*. ¶¶ 94–95. Skinner advised City Administrator Wendy Austin "that there were people at the City who didn't want him to be Chief," and Austin agreed. *Id*. ¶ 96. Skinner later learned that the allegations of sexual misconduct were brought by Defendant Rodriguez and five of his cohorts. *Id*. ¶ 101. Although Austin told Skinner that she believed him, she urged him nevertheless to retire. *Id*. ¶¶ 96–98. In addition, Countryman and Ahrens told Skinner that he would remain under investigation and subject to a polygraph examination. *Id*. ¶ 98. Because Skinner had been "subjected to comments and innuendos from Defendant Rodriguez and his friends throughout the year prior," he was concerned that the

allegations against him would not cease unless he retired. *Id.* ¶¶ 97, 99. According to Skinner, his "only option" was to retire. *Id.* ¶ 99. When Skinner notified the City of his intended retirement date, the City rejected his proposed date, telling him, "we don't want you here past the end of the year." *Id.* Following Skinner's retirement, the City discontinued its investigation. *Id.* ¶ 100. Although the other CPD employee who was allegedly involved in sexual misconduct with Skinner was initially demoted, she was later returned to her original position and pay. *Id.* ¶ 100. According to Skinner, the City went along with Defendant Rodriguez's efforts to remove obstacles to him becoming Chief and forced Skinner to retire over false and unsubstantiated allegations. *Id.* ¶ 104.

Hoyt Maciain joined CPD in February 2023. *Id.* ¶ 106. He was initially assigned to patrol and later transferred to CPD's detective division. *Id.* ¶ 107. In addition, he was one of the few employees at CPD who served as a Key Operator for Intoxilyzers *Id.* ¶¶ 108, 115. He also trained other CPD employees in subjects including CPR and first aid. *Id.* ¶ 108. Prior to his interactions with Defendant Rodriguez, Maciain's "name was associated with union activity after voicing a small question regarding potential 'force outs' for a voluntary event at" CPD. *Id.* ¶ 110. Maciain "made his position clear about supporting the union and policies and procedures of" CPD. *Id.* ¶ 111. After being promoted to detective in late 2023, Maciain was introduced to Defendant Rodriguez. *Id.* ¶ 112. Defendant Rodriguez questioned Maciain's loyalty to him, including asking if he was going to "go to the union" and if he was going to be a "team player." *Id.* ¶ 113. Maciain construed Defendant Rodriguez's questions as an attempt to ensure loyalty to Defendant Rodriguez and a suggestion that his failure to remain loyal would have negative consequences. *Id.* After this conversation, Defendant Rodriguez began targeting Maciain by constantly observing him and critiquing his conduct. *Id.* ¶ 114. Defendant Rodriguez, who was also a Key Operator, had Maciain removed from his Key Operator position, which resulted in decreased pay. *Id.* ¶ 118.

Maciain appealed his removal from that position, which upset Defendant Rodriguez. *Id.* ¶ 119. Around this time, Maciain began receiving “increased critique” from his direct supervisor, who was Defendant Rodriguez’s friend. *Id.* ¶ 120–21. Maciain believed that Defendant Rodriguez was constantly watching him and that his conduct was being reported to his supervisor. *Id.* ¶ 122. Maciain left CPD in August 2024, and four months later, he filed a complaint with CPD concerning the mishandling of an internal affairs investigation against him, which was handled by Lea County, rather than CPD. *Id.* ¶¶ 124–25. In December 2024, Maciain received a letter from acting Chief Rodriguez advising that CPD had sustained his complaint about the investigation and that the matter would be handled internally. *Id.* ¶ 126. Based on information received from City Administrator Wendy Austin, Maciain understood that he was eligible for rehire at CPD because his complaint about the mishandling of the internal affairs investigation had been sustained. *Id.* ¶ 128. Contrary to the information Maciain received from Austin, however, Defendant Rodriguez told Maciain over the phone that he was “free to apply[] but . . . wouldn’t be rehired because h[e] broke policy,” though Rodriguez would not identify which policy Maciain had allegedly violated. *Id.* ¶¶ 129–30. To Maciain’s knowledge, he did not have any write-ups or documented policy violations in his internal affairs file. *Id.* ¶ 131. According to Maciain, Defendant Rodriguez refused to consider him for rehire at CPD because of Rodriguez’s view that Maciain was “not a part of his loyal group and because of his past criticism of Defendant Rodriguez’s ingroup mentality.” *Id.* ¶ 132. Maciain attributes that refusal to “Maciain’s unwillingness to go along with Defendant Rodriguez’s demand for personal and political loyalty.” *Id.* ¶ 133.

## II. APPLICABLE LAW

### A. Rule 12(b)(6) Standard of Review

When deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a court must

"assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotations omitted). To survive Rule 12(b)(6) review, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility does not require "*detailed* factual allegations"; instead, it requires allegations that go beyond "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (emphasis added) (internal citations and quotations omitted); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, plausibility requires factual allegations that support a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility distinction matters because only "well-pleaded" allegations can be presumed true. *Id.* at 679. Well-pleaded allegations do not include speculation or assumptions not grounded in fact. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 558); *Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012). Nor do they encompass a "legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

The Rule 12(b)(6) analysis proceeds in two steps. *See Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 556). First, the Court categorizes the individual allegations as either factual and entitled to a presumption of truth, or merely legal conclusions that are not presumed true and may be ignored. *See id*. at 679. Second, the Court determines whether the factual allegations plausibly state a claim for relief. *See id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

If matters outside the pleadings are presented to and not excluded by the court, a motion to dismiss under Rule 12(b)(6) must ordinarily be converted to one for summary judgment. Fed. R. Civ. P. 12(d). Under Rule 12(d), courts have broad discretion to consider material beyond the pleadings or to resolve the motion on the pleadings alone. *See Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998). No conversion is necessary, however, when a court considers information that is subject to judicial notice, documents attached to or incorporated by reference into the complaint, or documents referred to in the complaint and central to the plaintiff's claims, where their authenticity is not disputed. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009); *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008).

## III. PARTIES' PRIMARY ARGUMENTS

With respect to Plaintiffs' First Amendment retaliation claims, Defendants observe that although the Second Amended Complaint alleges constructive discharge in retaliation for the exercise of First Amendment rights, it fails to address the elements of the five-part *Garcetti/Pickering* test. Dkt. No. 51 at 8. Relatedly, Defendants contend that Plaintiffs fail to identify any protected speech that precipitated the alleged retaliation, and they insist that Plaintiffs' more general allegations of First Amendment infringement are insufficient to plausibly suggest liability. *Id*. at 10 (citing *Iqbal*, 556 U.S. at 678–79). In response, Plaintiffs contend that the *Garcetti/Pickering* test is inapplicable because the conduct at issue was in retaliation not for speech but for political association. Dkt. No. 56 at 3. More specifically, they allege Defendants retaliated against them, in violation of the First Amendment, due to their lack of political affiliation and association with Defendant Rodriguez. *Id.* According to Plaintiffs, they enjoyed First Amendment protections for political associations by virtue of holding *nonpolitical* positions with CPD. Dkt.

No. 56 at 4. In reply, Defendants argue that Plaintiffs' First Amendment political association claims fail because Plaintiffs do not plausibly allege retaliation based on association or non-association with a political party or politician. Dkt. No. 57 at 3.

As to Plaintiffs' Fourteenth Amendment claims, Defendants contend that the Second Amended Complaint lacks supporting factual allegations, particularly as to what process Plaintiffs were denied. Dkt. No. 51 at 10–11. Plaintiffs, on the other hand, maintain that they have sufficiently pled facts to satisfy all three elements of their constructive discharge procedural due process claim. Dkt. No. 56 at 9. Defendants disagree. Dkt. No. 57.

## IV. ANALYSIS

In their Second Amended Complaint ("Complaint"), eleven former CPD officers bring federal claims against Defendants Jessie Rodriguez and the City of Carlsbad under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments (Count I) as well as state law claims for Breach of Implied Contract (Count II) and Intentional Infliction of Emotional Distress (Count III). Dkt. No. 50 at 21–26. The Court previously dismissed loss of consortium claims (Count IV) asserted by spouses of four former CPD officers for failure to state a claim. Dkt. No. 59. Defendants now ask the Court to dismiss Plaintiffs' federal claims under Federal Rule of Civil Procedure 12(b)(6) and to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* Dkt. No. 51.

### A. First Amendment Retaliation Claims

Although they each resigned their positions with CPD, Plaintiffs allege that they were forced to do so—that is, constructively discharged—"due to the sustained retaliation and coercion" to which they were subject at CPD. Dkt. No. 50 ¶ 147. According to Plaintiffs, Defendants' actions against them were "motivated by Plaintiff[s'] refusal to engage in compelled ideological or

political expression" in violation of the First Amendment. *Id.* ¶¶ 148–49. Defendants, in turn, contend that Plaintiffs fail to state plausible claims for First Amendment retaliation under *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Board of Education*, 391 U.S. 563 (1968).[3] Dkt. No. 51 at 8–9. Defendants insist that there is "no scintilla of protected speech even alleged" in the Complaint to satisfy the *Garcetti/Pickering* test. *Id.* at 9–10.

In response, Plaintiffs accuse Defendants both of mischaracterizing their First Amendment claims and of applying the wrong legal standard. Dkt. No. 56 at 2. Plaintiffs clarify: "Defendants use the test established for speech ***when this is a political association case***." Dkt. No. 56 at 2 (emphasis added). In support, Plaintiffs argue that the allegations of their complaint "plainly state[]" that they were subjected to retaliation "in response to their lack of political affiliation with Defendant Rodriguez's administration as Chief of Police." *Id.* Accordingly, Plaintiffs urge the Court to evaluate their First Amendment claims not under the *Garcetti/Pickering* test outlined by Defendants but instead under the test derived from two political association cases: *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980). Dkt. No. 56 at 4.

The Court cannot say that Defendants' reliance on the *Garcetti/Pickering* test was misplaced given Plaintiffs' allegations in their Complaint that Defendants' conduct "infringed upon their rights to freedom of speech and association." *See* Dkt. No. 50 ¶ 143 (emphasis added). After all, when speech or expression is intermixed with an employee's political association, courts apply the *Garcetti/Pickering* standard. *See O'Hare Truck Servs., Inc. v. City of Northlake*, 518 U.S. 712, 719 (1996). Even so, the Court construes Plaintiffs' response to effectively abandon any

---

[3] As Defendants observe, the test that derives from *Garcetti* and *Pickering* considers (1) whether speech was made pursuant to the employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interest as an employer in promoting efficient public service outweighs the plaintiff's free speech interests; (4) whether the speech was a motivating factor in the adverse employment action; and (5) whether the same employment decisions would have been made without the protected speech. Dkt. No. 51 at 9 (citing *Roberts v. Winder*, 16 F.4th 1367, 1381 (10th Cir. 2021); *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1132 (10th Cir. 2024)).

First Amendment claim premised on speech. *See* Dkt. No. 56 at 2 (insisting that "this is a political association case" to which the *Garcetti/Pickering* test is applicable). In light of this narrowing, the Court agrees with Plaintiffs that the *Elrod/Branti* line of cases is better suited to their claims. Notably, though, Defendants maintain that even if the Court applies the standard Plaintiffs prefer (*i.e*., the one derived from *Elrod* and *Branti*), their First Amendment claims nevertheless fail. The Court's analysis thus proceeds under the *Elrod/Branti* framework.

In *Elrod*[4] and *Branti*,[5] the Supreme Court addressed the constitutionality of political patronage and held that non-policymaking public employees enjoy protection under the First Amendment from adverse employment decisions based on their political affiliations. In *Branti*, the Court acknowledged that policymaking employees might justifiably be dismissed based on their political views if the government employer can show that it is "an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. In the wake of these seminal cases, the Tenth Circuit explained, in *Jantzen v. Hawkins,* 188 F.3d 1247 (10th Cir. 1999), that "[t]he First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation, unless their work requires political allegiance." 188 F.3d at 1251 (quoting *Mason v. Okla. Turnpike Auth*., 115 F.3d 1442, 1451 (10th Cir. 1997)).

To state a claim for a violation of freedom of association, a plaintiff must plausibly allege that "(1) political affiliations and/or beliefs were 'substantial' or 'motivating' factors behind [the

---

[4] In *Elrod*, Republican employees of the sheriff's department were fired or faced threats of discharge from the newly appointed Democratic sherif because they were not affiliated with or sponsored by the Democratic Party. 427 U.S. at 350–51. The Supreme Court held that discharge of public employees based on political patronage of that sort violated the employees' First Amendment rights. *Id.* at 373.

[5] In *Branti*, the newly-appointed Democratic public defender fired two assistant public defenders who were Republicans based solely on their political beliefs. 445 U.S. at 508–09. The Supreme Court held that the fired employees need not prove they were forced to *change* their political affiliations to prevail on their First Amendment claims and, instead, that it sufficed to prove discharge "solely for the reason that they were not affiliated with or sponsored by the Democratic Party." *Id.* at 516–17.

alleged retaliation]; and (2) [the plaintiff's] employment position[ ] did not require political allegiance." *Id*. Addressing the second prong first, Plaintiffs emphasize that they were *hired* – not elected or appointed – as police officers. Dkt. No. 56 at 4. They contend that they enjoyed First Amendment political association protections by virtue of holding *nonpolitical* law enforcement positions with CPD. *Id*. Defendants do not contend otherwise, and at this early stage, Plaintiffs' allegations that they were police officers at CPD support a reasonable inference that those positions did not require political allegiance. *Cf. Jantzen*, 188 F.3d at 1255 (concluding that there was no genuine dispute as to whether political loyalty was an appropriate requirement for a deputy sheriff, as there was "no compellingly politically loyal way to arrest a thief, no partisan way to serve a summons or to stop a speeding motorist").

As to the first prong of the inquiry, however, Defendants contend that Plaintiffs fail to plausibly allege that they were retaliated against based on their support for or affiliation with a political party, politician, or political idea. Dkt. No. 57 at 1, 3. Although Plaintiffs refer in their complaint to Defendant Rodriguez's "political capacity as *elected* Chief" (Dkt. No. 50 ¶ 141(b)), Defendants contend that the relevant municipal ordinance provides that the Chief of Police for the City of Carlsbad is *appointed* by the Mayor, rather than elected. Dkt. No. 57 at 3 (citing Carlsbad, N.M. Code of Ordinances § 2-131(a) (2025)).[6] Defendants reason that because Rodriguez was not

[6] Although Carlsbad Ordinance § 2-131(a) was not attached to or expressly referenced in Plaintiffs' Complaint, the Court acknowledges that it may, under some circumstances, consider city ordinances without converting a motion to dismiss into one for summary judgment if the ordinance is subject to judicial notice. *See Tellabs, Inc.*, 551 U.S. at 322; *see* Fed. R. Evid. 201(b) (courts "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Zimomra v. Alamo Rent-A-Car, Inc*., 111 F.3d 1495, 1503–04 (10th Cir. 1997) (concluding that a federal court may take judicial notice of municipal ordinances); *Newberry v. Mascaro*, No. 2:24-20 GJF/JHR, 2024 WL 5076294, at *14 n.4 (D.N.M. Dec. 11, 2024) (taking judicial notice of municipal ordinance on a motion to dismiss); *Brassell v. City of Santa Rosa*, 693 F. Supp. 3d 1200, 1207 n.3, 1211 n.7 (D.N.M. 2023) (same). But here, Defendants first cited the Ordinance in their reply to dispute Plaintiffs' allegation that Rodriguez was elected Police Chief. *See* Dkt. No. 57 at 3. Plaintiff thus had no opportunity to address the Ordinance and its potential application in the ordinary course of briefing. Moreover, it is not clear to the Court when the Ordinance was enacted in relation to when Defendant Rodriguez became Chief, as the Complaint does not identify that date. Ultimately, though, the viability of Plaintiffs' First Amendment political association claims does not turn on

*elected* as Police Chief, he was "not a politician," and Plaintiffs "cannot assert their freedom of political association claim . . . [based] on . . . affiliation with a political party or politician." *Id.* But as explained below, Defendants read the law and Plaintiffs' allegations too narrowly.

For their part, Plaintiffs maintain that the Complaint includes "detailed allegations" regarding how each Plaintiff faced retaliation based on political association. Dkt. No. 56 at 4. But in the Court's view, the allegations concerning *individual Plaintiffs'* political associations or non-associations are noticeably sparse. The Complaint alleges: (1) that Defendant Rodriguez threatened to take action against Danny Garrett because Garrett had been part of the former administration and worked collaboratively, as Assistant Chief, under the former Police Chief (Dkt. No. 50 ¶ 25); (2) that Andrew Carver "did not pledge loyalty to Defendant Rodriguez" and became one of the "targeted employee[s]" who was outside Defendant Rodriguez's "inner circle" (*id.* ¶¶ 35–36); (3) that Devon Stinson "was not part of Defendant Rodriguez's inner circle" (*id.* ¶ 42); (4) that John Sneathen declined an administrative position under Defendant Rodriguez's command and became a "target" of Defendant Rodriguez to be removed from CPD (*id.* ¶ 48); (5) that Defendant Rodriguez questioned Brian McCarty about "being against him" and threatening to leave CPD if Rodriguez became Chief, and McCarty's name was included on Defendant Rodriguez's "list of targeted employees" (*id.* ¶¶ 55, 57); (6) that Matt Langlitz was not part of Defendant Rodriguez's "inner circle" and became a "target for termination" (*id.* ¶ 63); (7) that Defendant Rodriguez told Richard Cage that he "hadn't shown loyalty to him" and Cage learned that he was "on the list of people that Defendant Rodriguez was determined to get rid of" (*id.* ¶¶

---

whether Defendant Rodriguez himself was appointed or elected. Instead, the claims' survival depends on whether a reasonable inference of political association retaliation arises from Plaintiffs' allegations that they were retaliated against for non-participation in political activities that supported the administration. Because the Court determines herein that Plaintiffs' allegations support such an inference, the Court need not take judicial notice of the Ordinance to resolve the Motion to Dismiss.

69, 70); (8) that Defendant Rodriguez "targeted" Isaac Flores (*id.* ¶ 78); (9) that Elizabeth Ferrales objected to Defendant Rodriguez's protection of a member of his "inner circle" and she was "targeted" by him; (10) that Shane Skinner preceded Defendant Rodriguez as Police Chief and during his tenure, Defendant Rodriguez and five of his cohorts made unsubstantiated allegations of sexual misconduct against Skinner to force him to retire (*id.* ¶¶ 89, 94, 101, 103, 104); and (11) that Defendant Rodriguez questioned Hoyt Maciain's loyalty to him, asking if he was going to "go to the union" and whether he would be "a team player" and then began "targeting" him (*id.* ¶¶ 113, 114). Standing alone, these allegations do not support a reasonable inference of retaliation based on political affiliation or non-affiliation. Rather, they suggest that Plaintiffs were not personally aligned with, and had not ingratiated themselves with, Defendant Rodriguez. In short, the allegations as to individual Plaintiffs fall far short of plausibly stating First Amendment political association claims.

Critically, though, the Complaint also makes allegations about Plaintiffs collectively that bear on their First Amendment political association claims. It alleges that shortly after becoming Police Chief, Rodriguez began requiring Plaintiffs "to demonstrate personal or *political* loyalty as a condition of continued employment." *Id.* ¶ 141 (emphasis added). Plaintiffs specify that the loyalty Defendant Rodriguez demanded of them included but was not limited to (1) publicly supporting his "leadership or political activities"; (2) "[p]articipating in non-job-related meetings or events to support Defendant in his political capacity as elected Chief"; and (3) [r]efraining from expressing disagreement with management decisions." *Id.* In addition, they allege that Defendant Rodriguez removed "signs, slogans and remnants of the prior administration, making it clear . . . that any reference to the prior administration was a sign of disloyalty to him." *Id.* ¶ 142. Finally, Plaintiffs allege that they "objected to and refused to comply with these loyalty demands" and that

Defendant Rodriguez's "requirements infringed upon their rights to freedom of . . . association." *Id.* ¶ 153.

Relevant here, the Tenth Circuit has emphasized that "[d]iscrimination based on political *non-affiliation* is just as actionable as discrimination based on political affiliation." *Gann v. Cline*, 519 F.3d 1090, 1093 (10th Cir. 2008) (citing *Rutan*, 497 U.S. at 64). That is, public employees enjoy the constitutionally-protected freedom "to believe and associate, *or to not believe and not associate*." *Rutan*, 497 U.S. at 76 (emphasis added). Thus, Plaintiffs may state a First Amendment retaliation claim if they plausibly allege that they were terminated "because of [their] political beliefs, affiliation, or non-affiliation" or for "failing to endorse or pledge allegiance to a particular political ideology." *Gann*, 519 F.3d at 1093–94 (citations omitted). In that regard, Plaintiffs allege that Defendant Rodriguez demanded their participation in political activities supporting the current administration while prohibiting continued support for the "prior administration." These allegations support a reasonable inference, if only barely, that Plaintiffs' political non-affiliation with the administration of which Defendant Rodriguez was a part motivated Defendants' adverse actions against them. Because the plausibility standard does not require detailed factual allegations at the Rule 12(b)(6) stage and because the Court must construe all reasonable inferences in Plaintiffs' favor, their allegations that they were constructively discharged for refusing to support the current administration's political activities and for failing to comply with Defendant Rodriguez's demands of loyalty suffice to state a First Amendment political association claim.

For these reasons, the Court will deny Defendants' Motion to the extent it seeks dismissal of Plaintiffs' First Amendment retaliation claims premised on the freedom of political association but will dismiss without prejudice any claim for First Amendment retaliation premised on the freedom of speech.

**B. Fourteenth Amendment Claims**

The parties agree as to the standard that applies to Plaintiff's Fourteenth Amendment claims. Indeed, both sides rely on *Lauck v. Campbell County*, 627 F.3d 805 (10th Cir. 2010) for the governing framework. *See* Dkt. No. 51 at 10–13; Dkt. No. 56 at 9. In *Lauck*, the Tenth Circuit identified three elements that a former employee must establish to prevail on a due process constructive discharge claim:

> First, he must show that a property right was violated. In this context the requirement is that he prove that the resignation was a constructive discharge—that is, the former employee resigned because of conditions so intolerable that a reasonable person would feel compelled to resign. Second, the employee must establish the *mens rea* necessary for a due-process violation—that the employer knew or intended (or perhaps was on notice) that such intolerable conditions were being imposed on the employee. Third, the employee must show that he was denied the necessary procedure—that the employer did not conduct an appropriate hearing to determine whether its actions would violate the employee's contractual rights.

627 F.3d at 813. Although Defendants suggest that it is "questionable" whether Plaintiffs have adequately pled *any* of the *Lauck* elements, they express "certainty" that Plaintiffs have not adequately pleaded the third (*i.e.*, denial of necessary procedure). Dkt. No. 51 at 11.

The Tenth Circuit has acknowledged that the constructive discharge due process context is unique, as "the employer may not even know that its actions have compelled the employee to quit[, and] when that is the case, the employer can hardly be required to provide notice or a hearing before the resignation; after all, the employer does not realize that the employee's employment is ending." *Lauck*, 627 F.3d at 812. Still, the court emphasized that an employer *cannot*, consistent with the Fourteenth Amendment, "circumvent the due-process requirements that would attend a true firing by trying to compel a resignation in a manner that violates the employee's property [rights]." *Id.* at 813. Because "a constructive discharge [does not] in itself constitute[] a violation

of due process," a plaintiff asserting a constructive discharge due process claim must also allege that the employer denied appropriate procedural safeguards. *See id.*

In their briefing, Plaintiffs insist that they state claims for the denial of due process because "no procedure of grievance meaningfully exists within" CPD. Dkt. No. 56 at 10. They submit that "[t]he level and extent of hostility in the workplace from CPD and the City Administration itself disallow[ed] an effective grievance procedure." *Id.* at 10. Insofar as an administrative grievance process *did* exist at CPD, Plaintiffs suggest that "the utility of such procedure [was] futile, as the City of Carlsbad and CPD . . . made clear that their practice of using an administrative remedy fails in general to provide relief and conform with New Mexico law." *Id.*. Plaintiffs go on to suggest that Defendant Rodriguez "functionally eroded away any usefulness of internal procedures" at CPD, making it futile to use that process. *Id.* at 10–11.

Defendants accuse Plaintiffs of conflating pre-deprivation process with post-deprivation administrative proceedings. Dkt. No. 57 at 5. As they see it, Plaintiffs must allege the denial of a *pre-deprivation* hearing to satisfy the standard enunciated in *Lauck*. *Id.* at 5. And yet, in the context of constructive discharge due process claims, the availability and adequacy of *post-deprivation* process may also be critical to the court's Fourteenth Amendment analysis. *See, e.g., Requena v. Roberts*, 893 F.3d 1195 (10th Cir. 2018) (reasoning that when a pre-deprivation hearing is rendered impossible, due process is nevertheless satisfied so long as a meaningful post-deprivation remedy is available and requiring the plaintiff to plead facts showing that his state post-deprivation remedy was inadequate) (citing *Hudson v. Palmer*, 468 U.S. 517, 532—33 (1984)); *Nunn v. Lynch*, 113 F. App'x 55, 59–61 (6th Cir. 2004) (explaining that when an employee resigns in response to a supervisor's allegedly intolerable conduct, a pre-deprivation hearing may be "impractical," and

requiring that the constructively discharged employee plead "the inadequacy of state or administrative processes and remedies") (citations omitted).

But even if Plaintiffs were right to address post-deprivation process and the futility of administrative processes at CPD, a significant problem remains: the Complaint itself does not contain the allegations Plaintiffs describe in their briefing (*i.e.*, that grievance procedures at CPD were unavailable, futile, and failed to comport with New Mexico law). Nor are such inferences supported by the factual allegations that *are* contained in the Complaint. Rather, Plaintiffs' Fourteenth Amendment theory, as articulated in their Complaint, is that Defendant Rodriguez subjected them to certain adverse employment actions that created a hostile and intolerable work environment, forcing them to resign. *See* Dkt. No. 50 ¶¶ 45–149. Lacking is any identification of the *process* Plaintiffs were allegedly denied, either before or after the alleged deprivations. As a result, the Complaint fails to state a plausible Fourteenth Amendment procedural due process claim.[7]

To state a procedural due process claim, Plaintiffs must plausibly allege that they were deprived of a constitutionally-protected interest *without constitutionally adequate process.* Assuming without deciding that Plaintiffs possessed protected property interests in their continued employment with CPD and that they plausibly allege constructive discharges, their procedural due process claims nevertheless fail because their Complaint omits factual allegations concerning the

[7] In what strikes the Court as a post-hoc attempt to piece together a due process theory from what *is* alleged in their Complaint, Plaintiffs point to allegations related to two individuals: Shane Skinner and Hoyt Maciain. *See* Dkt. No. 56 at 10–11 (citing Dkt. No. 50 ¶¶ 96–99, 124–26). Plaintiffs allege that Skinner was investigated for sexual misconduct following the circulation of rumors at CPD, asked to submit to a polygraph examination, and encouraged to retire. Dkt. No. 50 ¶¶ 96–99. Plaintiffs also allege that in December 2024, CPD sustained Maciain's post-resignation complaint that Lea County had mishandled an internal affairs investigation against him. *Id.* ¶¶ 124–26. Plaintiffs argue that these allegations demonstrate that CPD "created a culture devoid of administrative process." Dkt. No. 56 at 11. Even accepting those allegations as true, the Court cannot reasonably infer that CPD had no administrative process or that using it would have been futile. As a result, these allegations do not salvage Plaintiffs' Fourteenth Amendment claims.

process available to them or its inadequacy. For these reasons, the Court will dismiss without prejudice Plaintiffs' Fourteenth Amendment procedural due process claims.

### C. State Law Claims

Defendants ask the Court to dismiss Plaintiffs' federal claims for failure to state a claim and to decline supplemental jurisdiction over their remaining state law claims. Dkt. No. 51 at 11–12. Because Plaintiffs' First Amendment political association claims survive, dismissal of state law claims is not warranted. Consequently, Defendants' Motion is denied insofar as it seeks dismissal of Plaintiffs' state law claims.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 51) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) To the extent Defendants seek dismissal of Plaintiffs' First Amendment Retaliation claims premised on freedom of speech, the Motion is **GRANTED,** and those claims are dismissed without prejudice.

(2) To the extent Defendants seek dismissal of Plaintiffs' Fourteenth Amendment Procedural Due Process claims, the Motion is **GRANTED,** and those claims are dismissed without prejudice.

(3) To the extent Defendants seek dismissal of Plaintiffs' First Amendment Retaliation claims premised on freedom of political association, the Motion is **DENIED**.

(4) To the extent Defendants seek dismissal of Plaintiffs' state law claims, the Motion is **DENIED**.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***